1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JESSE WADE FINKENKELLER,

11            Plaintiff,                    CIV S-11-1261 GGH

12       vs.

13

14   MICHAEL J. ASTRUE,                     ORDER
     Commissioner of Social Security,

15

            Defendant.

16   _____/

17            Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying his application for Supplemental Security Income ("SSI")

19   under Title XVI of the Social Security Act ("Act").  For the reasons that follow, Plaintiff's

20   Motion for Summary Judgment is granted in part, the Commissioner's Motion for Summary

21   Judgment is denied, and this matter is remanded to the ALJ for further findings as directed in this

22   opinion.  The Clerk is directed to enter judgment for plaintiff.

23   BACKGROUND

24            Plaintiff, born June 4, 1956, applied on January 30, 2007 for disability benefits.

25   (Tr. at 70, 125-26.)  Plaintiff alleged he was unable to work since November 15, 2004, due to

26   obesity, chronic ischemic heart disease with or without angina, bilateral carpal tunnel syndrome,

1   and neck pains.  (Id. at 70, 125, 160.)  In a decision dated April 23, 2010, ALJ L. Kalei Fong

2   determined plaintiff was not disabled.  The ALJ made the following findings:[1]

3        1.    The claimant has not engaged in substantial gainful activity
              since January 30, 2007, the application date (20 CFR
4             416.971 et seq.).

5        2.    The claimant has the following severe impairments:
              coronary artery disease, status post angioplasty; bilateral
6             carpal tunnel syndrome, cervical radiculopathy;
              hyperlipidemia; obesity; and hypertension (20 CFR
7             416.920(c)).

8        3.    The claimant does not have an impairment or combination
              of impairments that meets or medically equals one of the
9             listed impairments in 20 CFR Part 404, Subpart P,
              Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
10
         4.    After careful consideration of the entire record, the
11            undersigned finds that the claimant has the residual

12

13       [1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
    Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to
14   disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in
    part, as an "inability to engage in any substantial gainful activity" due to "a medically
15   determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
    A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
16   See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
    137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
17            Step one:  Is the claimant engaging in substantial gainful
         activity?  If so, the claimant is found not disabled.  If not, proceed
18       to step two.
              Step two:  Does the claimant have a "severe" impairment?
19       If so, proceed to step three.  If not, then a finding of not disabled is
         appropriate.
20            Step three:  Does the claimant's impairment or combination
         of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
21       404, Subpt. P, App.1?  If so, the claimant is automatically
         determined disabled.  If not, proceed to step four.
22            Step four:  Is the claimant capable of performing his past
         work?  If so, the claimant is not disabled.  If not, proceed to step
23       five.
              Step five:  Does the claimant have the residual functional
24       capacity to perform any other work?  If so, the claimant is not
         disabled.  If not, the claimant is disabled.
    Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
25       The claimant bears the burden of proof in the first four steps of the sequential evaluation
    process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
26   burden if the sequential evaluation process proceeds to step five.  Id.

functional capacity to perform light work as defined in 20 CFR 416.967(b) except: he can lift and/or carry 20 pounds occasionally and 10 pounds frequently; he can stand and/or walk for 6 hours of an 8-hour workday; he can sit for 6 hours of an 8-hour workday; he can frequently reach; and he can frequently perform fine and gross manipulations.

5.   The claimant has no past relevant work (20 CFR 416.965).

6.   The claimant was born on June 4, 1956 and is 53 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since January 30, 2007, the date the application was filed (20 CFR 416.920(g)).

(Tr. at 9-19.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A.  Whether the ALJ Rejected Dr. Garg's Examining Opinion Without a Legitimate Basis for so Doing; B. Whether the ALJ Rejected Plaintiff's Testimony Without Legitimate Reasons for so Doing; and C.  Whether the ALJ Failed to Utilize the Expertise of a Vocational Expert Even Though Plaintiff had Significant Non-exertional Limitations.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

1  the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

2  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

3  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

4  as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

5  625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

6  ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

7  resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

8  omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

9  than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

10  ANALYSIS

11          A.  Dr. Garg's Examining Opinion

12                  Plaintiff contends that the ALJ improperly rejected the examining opinion of Dr.

13  Garg.[2]

14                  The weight given to medical opinions depends in part on whether they are

15  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

16  F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[3]  Ordinarily,

17  more weight is given to the opinion of a treating professional, who has a greater opportunity to

18  know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

19  Cir. 1996).

20  \\\\\

21

22          [2]  Although Dr. Garg is presented as a Social Security consultative examiner, it appears that he treated plaintiff on one occasion for Dr. St. Clair.  (Pl.'s Mot. at 21:10-11, Tr. at 317.)

23          [3]  The regulations differentiate between opinions from "acceptable medical sources" and
24  "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status
25  when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
26  accordingly are given less weight than opinions from "acceptable medical sources."

1        To evaluate whether an ALJ properly rejected a medical opinion, in addition to

2   considering its source, the court considers whether (1) contradictory opinions are in the record;

3   and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a

4   treating or examining medical professional only for *"clear and convincing"* reasons.  Lester , 81

5   F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be

6   rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

7   professional's opinion generally is accorded superior weight, if it is contradicted by a supported

8   examining professional's opinion (supported by different independent clinical findings), the ALJ

9   may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

10  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

11  weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

12  2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory and

13  supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

14  (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

15  881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

16  insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

17       The opinion of an examining physician is, in turn, entitled to
     greater weight than the opinion of a nonexamining physician.

18       Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990); Gallant v.
     Heckler, 753 F.2d 1450 (9th Cir.1984). As is the case with the

19       opinion of a treating physician, the Commissioner must provide
     "clear and convincing" reasons for rejecting the uncontradicted

20       opinion of an examining physician. .... And like the opinion of a
     treating doctor, the opinion of an examining doctor, even if

21       contradicted by another doctor, can only be rejected for specific
     and legitimate reasons that are supported by substantial evidence in

22       the record.

23  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  The opinion of a non-examining physician

24

25     [4]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;

26  (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1    may constitute substantial evidence when it is "consistent with independent clinical findings or

2    other evidence in the record." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). Such

3    independent reasons may include laboratory test results or contrary reports from examining

4    physicians, and plaintiff's testimony which conflicts with the treating physician's opinion.

5    Lester, 81 F.3d at 831, citing Magallanes, 881 F.2d at 751-55.

6           In this case, the ALJ stated that she was giving significant weight to the opinions

7    of both examining physician Dr. Garg and non-examining State Agency physician Dr.

8    Crowhurst, although she later discounted much of Dr. Garg's functional limitations. Dr. Garg

9    had examined plaintiff on May 6, 2007 with review of medical records, and diagnosed dyspnea

10   on exertion, neck pain, and carpal tunnel syndrome. At that time, plaintiff reported shortness of

11   breath on mild to moderate exertion since 2004, and chest pain with exertion. Plaintiff also

12   reported dizzy spells. (Tr. at 248.) Plaintiff additionally reported neck pain that was worse with

13   sitting or standing for long periods. He also felt numbness and tingling in the wrists but stated

14   that splints provided "some benefit." His symptoms were worse after holding things for a long

15   time. (Id. at 249.) Plaintiff could take his shoes and socks off and get on and off the exam table

16   without much trouble. Plaintiff had decreased range of motion in the neck. Forward flexion was

17   45 degrees, and extension was 45 degrees. Rotation was 60 degrees. Lateral flexion was 35

18   degrees. (Id. at 250.) The following findings were made in regard to the wrist joints:

19   "[e]xtension 0-60 degrees, flexion 0-60 degrees, radial deviation 0-20 degrees, ulnar deviation 0-

20   30 degrees bilaterally." (Id. at 251.) Plaintiff was diagnosed with coronary artery disease with a

21   note that plaintiff's history of dyspnea and chest pain were consistent with coronary artery

22   disease. This physician also noted, "[t]he claimant seems to get symptoms with mild to moderate

23   exertion." Symptoms were also consistent with cervical radiculopathy and decreased flexion of

24   the left upper extremity. Plaintiff's resting hand grip was normal. Bilateral carpal tunnel

25   syndrome was also diagnosed, more so on the left side. (Id. at 252.)

26   \\\\\

6

Dr. Garg's functional limitations were that plaintiff could stand and/or walk for two hours with breaks in an eight hour day, due to his heart and neck issues.  Plaintiff could sit for less than six hours due to his cervical radiculopathy.  Plaintiff did not need an assistive device.  Plaintiff could lift 20 pounds occasionally and ten pounds frequently.  Plaintiff could occasionally bend, stoop, and crouch.  Reaching and grasping were not limited, but handling, feeling, and fingering were limited on both sides.  Visual acuity was slightly decreased, with the recommendation that plaintiff might not be suited to jobs requiring very fine vision.  (Id.)

The ALJ gave Dr. Garg "significant weight" because he had found plaintiff was capable of light work.  Although plaintiff had some decreased range of motion of the cervical spine, he had "full range of motion of the lumbar spine and musculoskeletal joints; negative straight leg raises bilaterally; no evidence of edema, joint crepitus, effusion, deformities, or trigger points; full motor strength throughout; and intact senses and reflexes." (Id. at 14.)  As a result, the ALJ decided to give little weight to Dr. Garg's assessment that plaintiff could stand and/or walk for two hours in a day, explaining that Dr. Garg noted that plaintiff could ambulate without assistance, and that his coordination, station and gait were normal.  (Id. at 14.)  Furthermore, cardiac tests showed only low-normal to mildly decreased left ventricle ejection fractions.  Other objective tests, including imaging studies and pulmonary function testing, were normal and therefore would not be a basis for such a limitation.  (Id. at 15.)

The ALJ also did not rely on the manipulative limitations as found by Dr. Garg because although they were consistent with some findings, plaintiff had "full range of motion of the wrists, elbows, and shoulder bilaterally, full motor strength throughout the extremities, no sensory deficits in the extremities, and only 'marginal' left shoulder joint spurring...." Based on these findings, the ALJ concluded that plaintiff could frequently reach and perform fine and gross manipulations.  (Id. at 15.)

In regard to postural limitations, the ALJ found that Dr. Garg's opinion that plaintiff was limited to occasional posturing was not warranted based on his finding that plaintiff

1  had only some decreased range of motion of the cervical spine.  Such functional limitation was

2  not proportionate.  The ALJ also noted that there were no objective studies of plaintiff's cervical

3  spine, and therefore nothing to substantiate plaintiff's report of pain in this area.  There were also

4  no recommendations for surgery, and no significant and/or continuing treatment for neck or back

5  pain. (Tr. at 15.)  The ALJ rejected Dr. Garg's finding that plaintiff could not work at heights or

6  near hazards because plaintiff's cervical and cardiac symptoms were not as severe as plaintiff

7  alleged.  (Id.)  The ALJ also discounted Dr. Garg's visual limitations because the vision test he

8  conducted revealed plaintiff's vision to be 20/40 OS and 20/40 OD.  There was no record that

9  plaintiff had complained of visual limitations to any ophthalmologist or any other treating

10  sources.  (Id.)

11          Finally, the ALJ determined to rely on non-examining physician Dr. Crowhurst's

12  functional limitations instead.  The ALJ explained that this state agency physician could be relied

13  upon over an examining doctor because the record, as cited above, supported his limitations more

14  than Dr. Garg's.  On June 7, 2007, Dr. Crowhurst had found plaintiff could do light work with

15  limited reaching but no other limitations.  (Tr. at 256-60.)

16          Plaintiff argues that Dr. Garg's RFC was consistent with the findings of Dr. St.

17  Clair, plaintiff's treating physician, who stated on January 31, 2007 that he had completed

18  plaintiff's disability form, finding that his disability was permanent due to heart disease and neck

19  problems.  (Tr. at 318.)  At this time, Dr. St. Clair diagnosed methamphetamine addiction in

20  early remission, [5] coronary artery disease, post-angioplasty with stents, cigarette addiction,

21

22          [5] Plaintiff's substance and alcohol abuse have been mentioned a few times in the record
    and acknowledged by the ALJ.  (Tr. at 322, 318, 361, 363, 378, 12.)  On May 1, 2007, Dr. St.

23  Clair opined that the likelihood that plaintiff would recover from his methamphetamine addiction
    was remote.  In April and May, 2008, treating notes indicate that plaintiff was fabricating a

24  urination problem in order to avoid getting drug tested which meant that he was probably
    relapsing.  As of October 21, 2009, plaintiff was "currently clean," and his testimony was that he

25  had been clean for twenty months.  It is not clear whether plaintiff has recovered for a sufficient
    time such that drug/alcohol abuse would not interfere with his ability to work.  However,

26  plaintiff, of course, does not raise the issue as to do so may well preclude benefits on a per se

1  hepatitis C, angina pectrois, dyslipidemia, GERD, "ulnar neuropathy v. cervical spondylosis with

2  radiculopathy secondary to work-related neck injury," and hypertension.  (Id.)

3          The ALJ explained, however, that she assigned Dr. St. Clair little weight because

4  his finding of disability was not based on Social Security Administration regulations and

5  therefore it did not correlate to plaintiff's functional capacity within the meaning of the Social

6  Security Act.  (Id. at 15-16.)  Furthermore, Dr. St. Clair's opinion of disability is not binding on

7  this court.  "A statement by any physician that the claimant is disabled or unable to work is a

8  conclusion on the ultimate issue to be decided . . . and is not binding on the [ALJ] in reaching his

9  determination as to whether the claimant is disabled within the meaning of the [Act]."  Murray v.

10 Heckler, 722 F.2d 499 (9th Cir. 1983), (citing Burkhart v. Bowen, 856 F.2d 1335 (9th Cir. 1988),

11 20 C.F.R. §§ 404.1527 and 404.927); accord, Magallanes v. Bowen, 881 F.2d 747, 750-51 (9th

12 Cir. 1989).

13         Moreover, on May 21, 2008, over a year and three months after the disability

14 finding, Dr. St. Clair opined, for purposes of mandatory community service that plaintiff was

15 required to attend, that plaintiff could do light duty work with the restriction that he could not do

16 much walking and should not lift more than ten pounds at a time.  (Tr. at 360.)  These

17 restrictions are consistent with the light work assessed by the ALJ, which involves frequently

18 lifting ten pounds and lifting no more than 20 pounds, "a good deal of walking *or* standing, *or*

19 when it involves sitting most of the time with some pushing and pulling of arm or leg controls."

20 20 C.F.R. § 416.967(b) (emphasis added).  Plaintiff was not restricted from doing one of these

21 alternative definitions of light work.  Nevertheless, Dr. St. Clair's opinion was based on the

22 premise that plaintiff was going to do community service, not substantial gainful activity, and

23 therefore it may be inapposite.

24

25 basis.  The ALJ has not analyzed the issue.  See Bustamante v. Massanari, 262 F.3d 949 (9th Cir.
   2001).  Nevertheless, no one raises the drug/alcohol issue, and the court will not raise it sua
26 sponte in this case as the impact of drug usage is less than clearly obvious.

9

1    In regard to plaintiff's issue with the ALJ's assessment that plaintiff could stand

2 or walk over the course of an entire day, Dr. Garg had opined that plaintiff could only stand

3 and/or walk for two hours of an eight hour day with breaks, based on coronary artery disease and

4 cervical radiculopathy.   (Id. at 252.)  The ALJ, however, had explained that cardiac testing

5 revealed a relatively mild impairment.  The records referenced by the ALJ support his opinion.

6 See e.g. tr. at 347 (x-ray indicated "mild cardiomegaly with pulmonary vasculature congestion"),

7 348 (diagnosis from x-ray was COPD and coronary artery disease but "no scintigraphic evidence

8 for reversible ischemia").  It is true that plaintiff was admitted to the ER on May 30, 2008 with

9 acute coronary syndrome, and the impression was "severe hypotension and bradycardia" that

10 might either indicate ischemia or just an exaggerated response to the Persantine[6], but on

11 discharge acute biomarkers were negative and myocardial infarction had been ruled out.  (Id. at

12 349, 350.)  At this time, an echocardiogram revealed normal cardiac chamber sizes with normal

13 ejection fraction of 65 percent, and there was no regurgitant flow.  (Id. at 351.)  The

14 aforementioned records are dated May and June, 2008, however, and more recent cardiac records

15 were not available to either Dr. Garg or Dr. Crowhurst.

16    The most recent records by plaintiff's cardiologist, Dr. Wolk, indicate that as of

17 December 18, 2009, plaintiff's echocardiogram was abnormal with "left ventricular function

18 mildly reduced at 50% with mild inferior hypokinesis seen."  (Id. at 382.)  Tricuspid

19 regurgitation and mitral regurgitation were trace to mild.  Left atrial enlargement was mild.

20 There was also left ventricular enlargement but no pericardial effusion.  (Id.)  On January 20,

21 2010, plaintiff was diagnosed with coronary artery disease with previous stenting, chest pain

22 relieved by nitroglycerin, hypertension with recent low blood pressures, high cholesterol, and

23 history of heavy alcoholism and IV drug abuse.  (Id. at 378.)   The plan was to get an adenosine

24 nuclear stress test and increase medications with other therapies probably needed in future.

25

26    [6] Persantine is used to reduce the risk of blood clots after heart valve replacement.
Www.ncbi.nlm.nih.gov.

1   Plaintiff was advised to stop smoking.  (Id.)  Plaintiff received a stress test on February 1, 2010

2   which showed no ST abnormalities, no arrhythmias, and normal blood pressure.  (Id. at 377.)

3   Regadenoson Myocardial Perfusion imaging on that date indicated an abnormal myocardial

4   perfusion study, with limited ischemia.  Gated myocardial acquisition demonstrated "mildly

5   dilated end diastolic volume of 131 ml., low normal to mildly depressed ejection fraction of 49-

6   53%, hypokinetic inferior-posterior segmental wall motion."  (Id. at 376.)

7           The ALJ also referenced some of these and other mild findings in regard to

8   plaintiff's cardiac condition, including a February, 2007 stress cardiac imaging which indicated a

9   left ventricular ejection fraction of 50 percent which was "negative for infarct or Persantine-

10  induced ischemia," and July, 2007 notes indicating "'well-preserved' ventricular function and

11  'good flow and no high grade obstruction.'" (Id. at 17.)

12          Dr. Crowhurst echoed only those objective medical findings predating his June 7,

13  2007 report.  (Id. at 260.)  This non-examining physician noted that plaintiff's chest pain and

14  shortness of breath were "as likely related to obesity (BMI=35) and sedentary life style as to

15  CAD." (Tr. at 260.)  He noted that the persantine cardiolite test did not show plaintiff's heart

16  condition to be severe enough to be disabling.  He further stated that tests showed no evidence of

17  cardiac muscle problems, and ejection fraction was 50 percent.  Dr. Crowhurst was of the

18  opinion that Dr. Garg was too deferential to plaintiff's subjective complaints where there were no

19  objective findings in support.  (Id.)

20          In regard to any fine finger manipulation, the ALJ explained that light work does

21  not involve fine finger use but rather gross use of the hands.  Sedentary work is only eroded if

22  fine finger manipulation is significantly limited, and in this case the ALJ found that plaintiff was

23  not significantly limited in this respect.  (Tr. at 18-19.)   The ALJ rejected Dr. Garg's opinion on

24  this issue based on other objective evidence indicating "presentation of full range of motion of

25  the wrists, elbows, and shoulders bilaterally, full motor strength throughout the extremities, no

26  sensory deficits in the extremities, and only 'marginal' left shoulder joint spurring."  (Id. at 15.)

The ALJ cites exhibits 3F and 17F in support; however, these exhibits are the report of Dr. Garg who found limited finger manipulation, and Oroville Hospital records regarding x-rays of plaintiff's left shoulder.  (Id. at 15, 17, 248-53, 389.)  Nevertheless, evidence in support of the ALJ's finding is found in non-examining physician's report by Dr. Dann, issued October 2, 2007, in which this occupational specialist opined: "I do not feel any handling restrictions are appropriate at light level exertion w/such scant findings.  Initial decision and MER reviewed; I agree with Dr. Crowhurst."  (Id. at 328.)

In the one treating progress note by Dr. Garg, dated September 18, 2007, he diagnosed plaintiff with carpal tunnel syndrome and referred him to the orthopedic clinic for further evaluation.  (Id. at 317.)  On March 28, 2008, Dr. St. Clair re-referred plaintiff to the orthopedic clinic for consideration of carpal tunnel surgery.  (Id. at 369.)  Plaintiff asserts that Dr. St. Clair "obviously felt the severity of his carpal tunnel warranted surgery."  In fact, Dr. St. Clair stated only that he "re-referred [plaintiff] to the orthopedic clinic for consideration of carpal tunnel surgery.  The fact that he is on CMSP will probably negate the possibility of surgery." (Id.)  More importantly, there do not appear to be any records indicating plaintiff went to the orthopedic clinic after either of these referrals.  Other than the records mentioned here, most of the more recent records, between October, 2007 and October, 2009, contain very little mention or diagnosis of carpal tunnel syndrome.  (Tr. at 356-73.)  A nerve conduction study on August 24, 2007 indicated "moderately severe left sided sensori-motor type of Carpal Tunnel Syndrome," and "mild sensory type of Carpal Tunnel Syndrome, on the right side," but that clinical correlation was recommended.  (Tr. at 315.)

Plaintiff also takes issue with the ALJ's selective culling of the evidence, such as in regard to plaintiff's left shoulder x-ray which the ALJ failed to mention revealed degenerative changes of the glenohumeral joint, with "prominent inferior marginal spurring of the humeral head."  (Tr. at 389.)  This x-ray also found "no acute bony abnormalities."  (Id.)  The ALJ did acknowledge "'marginal' left shoulder joint spurring," but otherwise noted plaintiff's full range

of motion and full motor strength in the upper extremities.  (Id. at 15.)  Dr. Garg's range of

motion testing confirms the ALJ's findings.  Range of motion in the shoulders was normal other

than a ten degree limitation in extension.  Elbows had normal range of motion, as did wrist

joints.  Flexion of the fingers was normal to mildly limited.  (Tr. at 251.)  See

www.eatonhand.com; http://en.wikipedia.org/wiki/Interphalangeal_articulations_of_hand.

Furthermore, Dr. Garg found full motor strength bilaterally in the upper (and lower) exremities,

normal muscle bulk and tone, and lack of any sensory deficits in the upper or lower extremities.

(Id. at 251.)

    The problem here is that Dr. Garg appears to have placed significant reliance on

plaintiff's subjective complaints in making his functional assessment, which may have

inaccurately reflected plaintiff's true condition.  Nevertheless, the ALJ was not permitted to rely

on Dr. Crowhurst's non-examining functional assessment where this physician did not rely on

independent evidence.

    Here, the ALJ relied on the opinion of one non-examining state agency physician,

and gave less weight to the opinions of all examining physicians, including treating physician

Dr. St. Clair, and examining physician Dr. Garg, who, although relied upon "significantly," was

not relied upon in regard to his residual functional assessments.  Although the ALJ is permitted

to rely on the opinions of non-examining professionals, he may do so only where he gives

specific and legitimate reasons that are supported by an "abundance of evidence."  Id.  Such

evidence might include laboratory test results, contrary reports from examining physicians,

plaintiff's testimony which conflicts with a treating physician, higher expertise of non-examining

medical advisor, and suspect nature of examining physicians' test results.  Id., citing Andrews, 53

F.3d at 1043.  Further, in Magallanes, 881 F.3d at 753 (emphasis added), the court held that

where the conflicting non-treating opinion is based on independent objective findings, it could

constitute substantial evidence.  Most recently, the Ninth Circuit restricted the ALJ further by

holding that the opinion of a non-treating physician, when based on the same evidence relied on

1  by the treating physician, but supporting a different conclusion from the treating source, would

2  not be considered substantial evidence.  Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007).

3          The undersigned is troubled by the ALJ's reliance on a non-examining physician's

4  report which comes to a different conclusion than examining physicians, but is not based on any

5  independent evidence, but rather the same evidence.  Based on Lester, this opinion, without other

6  evidence, was insufficient to reject the residual functional capacity portion of Dr. Garg's opinion,

7  and Dr. St. Clair's opinion.  Furthermore, some of the cardiology records post-date Dr.

8  Crowhurst's opinion by a few years and were not available to either him or Dr. Garg.  See e.g. tr.

9  at 337-344, 374-82.  Significantly, the nerve conduction studies by Dr. Rana were also not

10  completed until after the reports of Dr. Garg, Dr. Crowhurst, and Dr. Dann, the non-examining

11  occupational specialist.  There were also many more recent treating records submitted to the ALJ

12  that were not in existence at the time of Dr. Garg's and Dr. Crowhurst's reports.  See tr. at 356-

13  73, 383-410.

14          Generally, where the ALJ fails to provide adequate reasons for rejecting the

15  opinion of a treating or examining physician, the opinion is credited as a matter of law.  Lester,

16  81 F.3d at 834.  However, in this case, as discussed above, Dr. Garg's opinion as to plaintiff's

17  functional limitations is not well supported, is at times internally inconsistent, relies excessively

18  on plaintiff's subjective reports, and did not have the benefit of substantial records post-dating

19  the evaluation.  Consequently, the court cannot credit the treating physician's opinion as a matter

20  of law.  Instead, the court finds that remand is necessary for an additional medical consultation

21  by a consultative evaluator who is provided full access to plaintiff's prior medical records.  After

22  reevaluation of plaintiff's residual functional capacity, the ALJ may also deem it appropriate to

23  \\\\\

24  \\\\\

25  \\\\\

26  \\\\\

conduct a supplemental hearing with vocational expert testimony regarding any limitations

found, if necessary.[7]

CONCLUSION

        Accordingly, IT IS ORDERED that:

        1.  Plaintiff's Motion for Summary Judgment is GRANTED in part pursuant to

Sentence Four of 42 U.S.C. § 405(g), the Commissioner's Cross Motion for Summary Judgment

is DENIED, and this matter is remanded for further findings in accordance with this order.  The

Clerk is directed to enter Judgment for plaintiff.

        2.  Given the satisfactory showing made in the Declaration of Bess M. Brewer

(Doc. No. 18), the January 20, 2012 order to show cause why this case should not be dismissed

for lack of prosecution is discharged.

DATED: August 23, 2012

              /s/ Gregory G. Hollows
         UNITED STATES MAGISTRATE JUDGE

GGH/076/Finkenkeller1261.ss.wpd

---

   [7]  Plaintiff also challenges the ALJ's credibility finding.  Because the matter is being remanded for further proceedings, the court will not reach this argument.  However, on remand, if plaintiff's testimony regarding his subjective complaints is discredited, the ALJ must, in the absence of affirmative evidence showing that plaintiff malingering, set forth clear and convincing reasons for rejecting plaintiff's testimony." Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).